---

T.W., PLAINTIFF–RESPONDENT, v. A.W., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 7, 1988—Decided May 5, 1988.

676

Before Judges DREIER and ASHBEY.

*John M. Apicella* argued the cause for appellant (*John M. Apicella,* on the letter brief).

*Wade S. Baker* argued the cause for respondent (*Essex–Newark Legal Services,* attorneys; *Mary M. Theroux,* on the letter brief).

The opinion of the court was delivered by

ASHBEY, J.A.D.

Defendant appeals from a May 4, 1987 Family Part order which vacated a November 18, 1986 order requiring plaintiff and defendant to submit to human leucocyte antigen (HLA) paternity blood tests, along with 13–year–old K.W. who was born during the parties' marriage.[1] Defendant urges on appeal that the judge erred in granting the motion of the Essex County Division of Welfare (Welfare) for reconsideration of the order for blood tests and that, because the issue of paternity had never been adjudicated between the parties, he was always able to contest paternity. We affirm.

The parties were married on September 17, 1966. One child, K.W., was born on March 7, 1973, and the parties separated

---

[1]The child was never represented in the litigation. *See R.* 5:14–1. We are nonetheless satisfied that her interests were adequately represented, subject to her own rights under the Parentage Act.

prior to 1974. On January 4, 1974, plaintiff filed a complaint for support against defendant in the then Juvenile and Domestic Relations Court of Essex County (Court) (now absorbed in the Family Part of the Chancery Division). On January 16, 1974, the Court entered a temporary order, directing defendant to pay $70 per week for his wife.[2] The order further directed that blood tests be scheduled to determine the paternity of K.W. which defendant evidently disputed.[3] On May 7, 1974, the Court ordered defendant to pay $200 in arrears and ordered that blood tests be performed immediately. On May 8, 1974, arrears were set at $390, the $70 per week support order was continued and defendant was ordered to pay $10, bi-weekly, to satisfy arrears and to pay $65 by May 10, 1974. On June 11, 1974, blood tests were taken but no hearing was held.[4] On February 26, 1975, the Court continued the prior order. On August 12, 1975, arrears were set at $1,005; support was continued at $70 per week, arrears were continued to be paid at the rate of $10, payable bi-weekly, and defendant was placed on two years of "probation." That order further directed defendant to pay the $75 due for his wife's and the child's blood tests and to produce the report by August 21, 1975. On August 20, 1975, the laboratory advised the Court that defendant could not be excluded as the father.

Following defendant's request for an adjournment concerning his hearing on paternity, the Court ordered that a hearing be held on January 16, 1976, making that date peremptory and finding that defendant had been avoiding court. On January

---

[2]This record on appeal is sparce. The March 25, 1987 written opinion of Judge Weiss whose order is the subject of this appeal recites a procedural history which neither party disputes.

[3]At the November 18, 1986 hearing prior counsel for the "Office of the Child Support" represented that defendant had admitted paternity during an early court hearing.

[4]These tests are not in the record. Evidently these tests were not paid for by defendant, and the laboratory refused to release the results.

16, 1976, defendant was ordered to pay $70 per week support for his wife and $20 per week support for K.W. That order said that defendant was under the legal obligation to support his "family." Apparently, however, no evidence had yet been proffered in a hearing on the issue of K.W.'s paternity.

On March 3, 1976, the court ordered a hearing for March 16, 1976, which was later rescheduled to March 26, 1976. On March 26, 1976, defendant did not appear. The court fixed arrears at $1,785 and scheduled a paternity hearing for May 10, 1976. All parties were notified.

On May 10, 1976, defendant appears to have been incarcerated for failure to pay support. By order dated May 12, 1976, the Court ordered that, "Deft's application for paternity hearing is dismissed with prejudice. Pay $100 today and release. Pay $400 on Friday, May 14, 1976. Appear in court on Monday, May 17, 1976 with both counsel. Release all monies to petitioner." [5] The record fails to reveal whether defendant appeared on May 17, but on May 18, 1976, defendant filed a notice of motion to reduce his support obligations, making no reference to further denial of paternity. Plaintiff cross-moved for an increase in support. By the May 27, 1976 order, arrears were set at $795, child support was continued "on a temporary basis" at $20 per week with $30 a week on arrears. Alimony was apparently discontinued at this time.

---

[5] By letter dated March 27, 1987, defendant suggested for the first time that the May 12, 1976 order had no validity because it was entered while he was not present in court, having been incarcerated. Nothing in the record suggests that he was not brought to court on that date for a hearing on his detention. There appears to have been a disjunctive reference in the judge's notes of May 10, 1976, to "no appearance" at the time the paternity hearing was called, with a bench warrant to issue and a release figure of $700 set. There is a note on the jacket that neither defendant nor counsel appeared apparently concerning the paternity. The terms of the May 12, 1976 release order imply that the judge then knew that defendant had been incarcerated (perhaps as a result of the same bench warrant), and that defendant knew when the judge set a release figure which was lower than the one he had earlier designated.

Defendant's divorce judgment recites that the matter was heard on May 19, 1976. However, the judgment was entered on November 5, 1976. Plaintiff did not appear in that proceeding and its terms were therefore *ex parte*. The judgment of divorce states that jurisdiction concerning paternity and support was retained by the Court in a pending paternity action.

We need not here recite the terms of the many orders entered in 1977, 1978 and 1979 concerning modification and enforcement of the child support order except to note that an April 19, 1977 order recited that the Essex Division of Welfare was then the "beneficiary" of the child support orders.[6] Suffice to say that various orders stated that defendant had an obligation to support K.W. as his child and there is nothing in the orders to indicate that he disputed this statement.

In November of 1985, plaintiff requested an increase in support. Before a Family Part hearing officer on January 4, 1986, a Welfare representative and defendant appeared. The order of support was increased to $50 per week pursuant to an order entered February 4, 1986. Upon learning of this order, plaintiff, who had not been present, obtained separate counsel. On April 8, 1986, both parties and Welfare appeared before the Family Part. Defendant requested an HLA test. The court ordered the parties to submit briefs on the propriety of ordering an HLA test under the circumstances of the case.

Subsequently, the court notified plaintiff and defendant of a November 18, 1986 hearing date. Welfare was not notified, however. On November 18, 1986, the Family Part ordered that the February 4, 1986 order be continued and that HLA tests should be administered "without prejudice." The judge conditioned the order by saying that a non-paternity adjudication would not *necessarily* relieve defendant of a support obligation (emphasis added). Plaintiff's counsel requested and was grant-

---

[6]This accords with plaintiff's statement in her brief that she has been receiving welfare payments for "more than a decade."

ed a stay of the order to appeal. No appeal was taken, however. The November 18, 1986 order recites that only counsel for plaintiff and defendant were present.

On December 22, 1986, Welfare moved for reconsideration of the November 18, 1986 order because it was based upon a hearing for which it was never notified. Plaintiff joined in that motion, urging that additional authority concerning defendant's belated parentage challenge should be considered. (*Moore v. Hafeeza*, 212 *N.J.Super.* 399 (Ch.Div.1986)).

On March 5, 1987, Judge Weiss granted Welfare's reconsideration motion. He reserved decision and by letter opinion of March 25, 1987, he vacated the November 18, 1986 order on the ground that the May 12, 1976 order dismissing defendant's application for a hearing on the issue of paternity was final, conclusive and binding. The May 4, 1987 order, from which defendant appeals, ensued.

■ Defendant first challenges the judge's jurisdiction to consider Welfare's motion for reconsideration, relying upon *R.* 4:50–1. The motion was granted on the grounds of mistake, inadvertence, surprise, or excusable neglect, (*R.* 4:50–1(a); *see R.* 1:7–4; 4:49–2). The judge stated, "[i]n the absence of an opportunity by the Welfare Board to appear and present its opposition to the defendant's application, the Court's order of November 18 may not stand."

We first note that the November 18 order was interlocutory. Thus a stay pending appeal meant a stay pending a motion for leave to appeal. While on November 22, 1986, Welfare apparently moved under *R.* 4:50–1 for reconsideration, neither party was bound by that rule. *See Johnson v. Cyklop Strapping Corp.*, 220 *N.J.Super.* 250, 257 (App.Div.1987). Welfare clearly had the right to reopen the matter in any event. It was a party of record. *See Essex Cty. Div. of Welfare v. J.S.*, 205 *N.J.Su-*

*per.* 244, 247, 500 *A.*2d 742 (App.Div.1975).[7]  This interpretation accords with the New Jersey Parentage Act, *N.J.S.A.* 9:17–38 *et seq.*, which provides that, "the court has continuing jurisdiction to modify or revoke a judgment or order." *N.J.S.A.* 9:17–56.[8]

Defendant also challenges the merits of the order reversing an order for HLA testing. The judge's decision was based on a finding that the May 12, 1976 order dismissing defendant's claims was *res judicata, see Charlie Brown of Chatham v. Board of Adjustment,* 202 *N.J.Super.* 312, 327 (App.Div.1985), and that defendant's subsequent conduct caused his application to be barred by laches, *see Moore v. Hafeeza, supra,* 212 *N.J.Super.* at 406.

■■■ The doctrine of *res judicata* applies when there exists (1) a final judgment by a court of competent jurisdiction, (2) identity of issues, (3) identity of parties and (4) identity of the cause of action. *City of Hackensack v. Winner,* 162 *N.J.Super.* 1, 27–28 (App.Div.1978), mod. 82 *N.J.* 1 (1980). Collateral estoppel is the branch of *res judicata* which bans relitigating an issue of fact or law that has been actually determined on the merits in a prior proceeding. *Allesandra v. Gross,* 187 *N.J.Super.* 96, 103 (App.Div.1982). *Res judicata* applies when either party attempts to relitigate the same cause of action. Collateral estoppel applies when either party attempts to relitigate facts necessary to a prior judgment. *See Allesandra v. Gross, supra,* 187 *N.J.Super.* at 104, quoting *Mazzilli v. Accident, etc., Cas. Ins. Co., etc.,* 26 *N.J.* 307, 313–314 (1958). *See also Restatement, Judgments* 2d, sec. 17 at 148 (1982).

---

[7]*See also N.J.S.A.* 9:17–45a (any welfare agency, State or County, has a right to bring or defend any paternity action). *See also Peralta v. Heights Medical Center,* —— *U.S.* ——, 108 *S.Ct.* 896, 99 *L.Ed.*2d 75 (1988).

[8]While the judge never articulated his ruling on plaintiff's motion for reconsideration, we have no doubt that plaintiff's motion was also properly granted. *See Johnson v. Cyklop, supra,* 220 *N.J.Super.* at 257.

■ We need not decide whether either doctrine applies.[9] In our view, defendant's belated request for HLA testing was barred in any event. K.W. had spent her entire life relying upon the presumption of legitimacy concerning a child born during the marriage,[10] *State v. Pidoto*, 129 *N.J.Super.* 405, 410 (App.Div.1974). Even if the 13–year history of support orders and the May 12, 1976 dismissal were not evidentially based, defendant's conduct over 13 years clearly estopped him from relief from his child support obligations. *Cf. Miller v. Miller*, 97 *N.J.* 154, 163–166 (1984).

We recognize that imposing liability for child support on a person who is neither the biological nor adoptive parent is exceptional. *M.H.B. v. H.T.B.*, 100 *N.J.* 567, 579 (1985). In its opinion favoring the obligation, the Court there stated that the New Jersey Parentage Act "did not intend to preclude the equitable imposition of a duty of child support" when equity so requires. *Id.* at 578.[11] In *M.H.B. v. H.T.B.*, the identity of the father was known, all parties having long conceded that defendant was not biologically related. We contrast that fact to this case where defendant seeks to introduce the paternity issue after apparent acquiescence in an adverse determination over many years. This 13–year record reveals no father figure other than defendant for K.W.

---

[9]If considered as *res judicata, see Restatement, Judgments*, 2d sec. 17, comment d at 150 (1982). "If the judgment is erroneous, the unsuccessful party's remedy is to have it set aside or reversed in the original proceedings. Such a remedy may be sought by motion for a new trial [*R.* 4:49–1] or other relief in the court that rendered the judgment, [*R.* 4:49–2; *R.* 4:50–1] or by appeal." Defendant made no formal application under *R.* 4:50–1(f) on the ground that the existence of HLA tests, not available in 1976, was an extraordinary circumstance requiring relief.

[10]This presumption also exists under the New Jersey Parentage Act, *N.J.S.A.* 9:17–43a(1). We assume that her birth certificate, school records, etc. reflected this presumption. Defendant does not suggest otherwise.

[11]Judgment of the Appellate Division was affirmed by an equally divided Court.

Defendant relies upon the New Jersey Parentage Act, *N.J. S.A.* 9:17–38 *et seq.*, enacted in 1983, contending that he had until five years after the child had attained the age of majority to bring a paternity action. *N.J.S.A.* 9:17–45b. We are not here concerned, however, with the relevant statute of limitations. *Cf. B.P. v. G.P.*, 222 *N.J.Super.* 101 (App.Div.1987), certif. den. 108 *N.J.* 579 (1987). The extended time during which a parentage action may be brought is intended to benefit children, not to deprive them of their reliance upon a presumption of legitimacy. *Cf. N.J.S.A.* 9:17–45d.

Defendant nonetheless urges that no one would be harmed by the testing because the judge said that his support obligation would not automatically terminate if non-paternity were established.[12] This argument assumes defendant's role in the parent-child relation is of a financial nature only. To the contrary, an established parent-child relationship is a status so valued, that it is of constitutional magnitude. *Stanley v. Illinois*, 405 *U.S.* 645, 651–652, 92 *S.Ct.* 1208, 1212–1213, 31 *L.Ed.*2d 551, 558–559 (1972). The State may only interfere with that status when it is in the best interest of the child. *In re N*, 96 *N.J.Super.* 415, 425 (App.Div.1967). " 'The old conception of paternity proceedings as being designed chiefly to spare the public the expense of supporting the child has been replaced by a more enlightened view. Courts now hold that the chief purpose of the paternity proceeding is to secure the health, welfare and happiness of the child.' " *In re Sandy M.*, 524 *N.Y.S.*2d 639, 642 (N.Y.Fam.Ct.1988), quoting Schatkin, *Disputed Paternity Proceedings*, sec. 1.09 at 1–48–1–49 (4th ed. 1985). This goal is clearly advanced by identifying two parents whenever possible. *C.M. v. C.C.*, 152 *N.J.Super.* 160, 167 (J. & D.R.Ct.1977). To deprive a child of a known parent figure, even if not biologically related, may have severe psychological effects. *Hoy v. Willis*, 165 *N.J.Super.* 265, 273 (App.Div.1978).

---

[12]This representation must be judged in light of the many support enforcement procedures in this history.

Absence of paternal lineage must still be considered a significant harm in a society where the stigma of illegitimacy continues, despite changing social values. As K.W. prepares for the future, one considers the dilemma she would face when called upon to furnish the name of her father. Must she be required to insert the word, "unknown"? *See McBride v. Heckler,* 619 *F.Supp.* 1554, 1560 (D.N.J.1985).

In *Moore v. Hafeeza, supra,* 212 *N.J.Super.* at 406, the Family Part held, in part, that a mother's paternity action brought when the child was 16 years old, was barred by laches. Under that doctrine,

'The mere passage of time, of course, does not constitute laches.' ... Laches in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of that right. [*All State v. Howard Savings Inst.,* 127 *N.J.Super.* 479, 489–490 (Ch.Div.1974) quoting 2 *Pomeroy's Equity Jurisprudence* (5th ed. 1941), sec. 419(d) at 177–79].

We agree with this reasoning. Our review of this record persuades us, as it did Judge Weiss, that defendant in 1986 may not raise the paternity issue which he has allowed to remain dormant since 1976. Had he been diligent, we have no doubt that a paternity order would have been entered which would have been unchallengeable. *See N.J.S.A.* 9:17–41b. He may not now use his lack of diligence to subject unrepresented, now 15–year–old, K.W. to the anxiety of HLA testing.[13] We do not foreclose K.W. or someone on her behalf from raising the issue within the time limits of *N.J.S.A.* 9:17–45b, should that appear in her best interests.

The order appealed from is accordingly affirmed.

---

13At the March 5, 1987 hearing, counsel for Welfare said, "we're talking about what I believe to be a very devastating experience for the child who is very distraught about it...."